August 28, 1979

## 79-63 MEMORANDUM OPINION FOR THE GENERAL COUNSEL, DEPARTMENT OF ENERGY

### Real Property—Title—Authority of the Attorney General (40 U.S.C. § 255)—Strategic Petroleum Reserve

This memorandum responds to your request for our opinion with respect to the application and interpretation of certain Department of Justice regulations in connection with a potential real property transaction relating to the Strategic Petroleum Reserve (SPR) under the Energy Policy and Conservation Act of 1975 (EPCA), 42 U.S.C. § 6201, *et seq.* The regulations in question (which are unpublished) set forth the standards pursuant to which the Attorney General exercises the authority, conferred on him by § 355 of the Revised Statutes, 40 U.S.C. § 255 (hereinafter § 255), to pass on the sufficiency of title to lands to be acquired by the United States.[1] As we understand it, you wish to know whether § 255 applies to transactions for the SPR and, if so, whether under the regulations the transaction in question should be approved. For the reasons that follow, it is our conclusion that your Department's real property transactions with respect to the SPR must be subjected to the Attorney General's review process contemplated by § 255. It is our further conclusion that the application of the regulations implementing § 255 requires disapproval of the transaction outlined in your request.

Although the statutory scheme of the EPCA is not a simple one, an understanding of its several central provisions is important to a resolution of the issues involved. Section 154(a) of the EPCA, 42 U.S.C. 6234(a), mandates the establishment of locations for the storage of petroleum products

---

[1] Section 255 provides in pertinent part:

Unless the Attorney General gives prior written approval of the sufficiency of the title to land for the purpose for which the property is being acquired by the United States, public money may not be expended for the purchase of the land or any interest therein.

(known as the SPR). Under § 159(f) the Secretary of Energy is authorized, "to the extent necessary or appropriate to implement" the SPR program, to:

(B) acquire by purchase, condemnation, or otherwise, land or interests in land for the location of storage and related facilities;

(C) construct, purchase, lease, or otherwise acquire storage and related facilities;

(D) use, lease, maintain, sell, or otherwise dispose of storage and related facilities acquired pursuant to this part;

\* \* \* \* \* \* \*

(F) store petroleum products in storage facilities owned and controlled by the United States or in storage facilities owned by others if such facilities are subject to audit by the United States;

(G) execute any contracts necessary to carry out the provisions of such Strategic Petroleum Reserve Plan, Early Storage Reserve Plan, proposal or amendment \* \* \* .

As defined in § 152(4), 42 U.S.C. 6232(4), an "interest in land" which the Secretary is authorized to acquire under (B) includes

any ownership or possessory right with respect to real property, including ownership in fee, an easement, a leasehold, and any subsurface or mineral rights.

Section 154(b) provides for submission of an SPR plan to Congress, which must detail the Secretary's plans for designing, constructing, and filling the Reserve. All proposals to acquire land and construct facilities must be included in the plan. Under § 159, 42 U.S.C. § 6239, the plan does not become effective and may not be implemented unless neither House of Congress has disapproved it within 45 days (or both Houses affirmatively approve it). Although amendments may be made to the plan, these too must be submitted to Congress for its review prior to taking effect. We understand that the real property transaction that is the subject of your request would, pursuant to this requirement, ultimately be submitted to Congress as an amendment to the existing SPR plan.

Under § 255, the Attorney General has the responsibility for passing on the "sufficiency" of the title being acquired by the United States whenever public money is expended for the purchase of land "or any interest therein." While § 255 was codified in its present form in 1970, the Attorney General has been vested with the responsibility of approving titles to land acquired by the United States or its agencies under successive statutes since the mid-19th century.[2] We have been informed that the Land and

---

[2] The earliest statutory precursor of § 255, enacted in 1841, 5 Stat. 468, made it "the duty of the Attorney General to examine into titles of the land or sites for the purpose of erecting thereon armories, and other public works or buildings \* \* \*."

Natural Resources Division (Land Division) of this Department has consistently taken the position that if Congress wishes to establish exceptions to the requirement of Attorney General approval under § 255, it must do so explicitly.

The regulations implementing § 255 require a determination "that the proposed interest in property is in accord with the authorizing legislation and that such interest is sufficient for the purposes for which the property is being acquired." Regulation 5(a). In administering these regulations, the Land Division has generally taken the position that where permanent improvements of substantial value are to be erected, the only interest sufficient to protect the Federal investment is a full fee simple title. Thus, Regulation 5, "Character of Title Which May be Approved," provides in pertinent part as follows:

> (b)   * * * [T]here may be restrictive covenants or agreements in conveyances to prior owners under which the title might revert to the grantors in such deeds upon the use of the property for an unauthorized purpose or for other reasons. *When permanent type improvements or improvements of substantial value are to be erected on lands, a defeasible title to such lands is not acceptable and must not be approved, unless the estate is clearly authorized by the Congress.*

> (c)   Other covenants and conditions in the deeds to the United States or in prior deeds may limit the use of the property in a manner which may prevent the sale and disposition of the property under laws relating to the disposition of surplus property so as to prevent the recovery of a substantial portion of the Government's investment in the property. *Titles are not acceptable which are subject to such covenants and conditions in the absence of clear authorizing legislation.*

> *   *   *   *   *   *   *

> (f)   *A defeasible fee title to land may be acquired by purchase or donation when no permanent improvements are to be erected thereon,* provided that the statute authorizing the acquisition in question does not preclude acquisition of title to the interest which the agency intends to acquire, the interest intended to be acquired is sufficient to permit the use of the land contemplated, and the consideration for the land has been determined with reference to the value of the limited interest that is acquired. In the event it is decided at some future time to erect permanent improvements on such land, the provision for defeasance must be eliminated. [Emphasis added.]

These regulations recognize that Congress may authorize the acquisition of any interest in real property and may empower the making of expenditures to improve the property, no matter how risky; but they also recognize that

339

"it is very seldom that a particular interest is authorized by legislation." Regulation 4(a). A general legislative authorization to acquire and build on land has not been regarded as sufficient to bring a particular transaction within the exceptions in Regulation 5(b) and 5(c). Thus, in cases where § 255 applies, this Department has regularly refused to approve the acquisition of less than fee simple title if permanent and substantial improvements are to be constructed on the land, unless Congress has separately and explicitly approved the particular acquisition. We see no legal basis upon which to take issue with this consistent interpretation of the reach of § 255, and we do not understand your request to question this interpretation of the Attorney General's responsibility.

As explained in your request, your Department proposes to acquire a servitude to an underground mine cavern at Cote Blanche, Louisiana, to an underground buffer zone around the cavern, and to sufficient surface area to install or construct "pumps, valves, and other support equipment and facilities." You state, that under the proposed terms of acquisition, the servitude would be granted for the purpose of storing liquid hydrocarbons, and for that purpose only, and that

> [i]f the Government no longer required and used the premises for the specific purpose for which the servitude was granted, i.e., the storage of liquid hydrocarbons, the Government would not be able to use the servitude for other Government purposes and could not enjoy the benefit of the improvements made thereon.

While it is not yet clear exactly how great an investment is anticipated in order to ready the site for petroleum storage, your Office has informed us that it would be substantial. The improvements that would be installed or constructed would not be readily removable in the event that the site were determined at some point to be no longer useful, or if for some other reason the United States were no longer in a position to utilize the land as a petroleum storage facility.[3] In addition, you have identified six circumstances the occurrence of any of which would, under Louisiana law, result in the termination of the servitude:

1. By the destruction of the estate which owes the servitude, or of that to which the servitude is due, or by such a change taking place that the thing subject to the servitude cannot be used;

2. By confusion;

3. By the abandonment of that part of the estate which owes the servitude;

4. By the renunciation of the servitude on the part of him to whom it is due, or by the express or tacit remission of his right;

---

[3] Indeed, there appears to be some question whether, under Louisiana law, the United States could retain title to the improvements erected on the site in the event the servitude were to lapse. *See* La. Civ. Code §§ 505, 508; Yiannopoulos, *Civil Law of Property* § 46, at 141 (1968).

5. By the expiration of the time for which the servitude was granted, or by the happening of the dissolving condition attached to the servitude; or

6. By the dissolution of the right of him who established the servitude.

Some of these occurrences appear to be within the control of the United States (e.g., renunciation and "confusion") but others are not. One troublesome possibility which you recognize is that the estate that owes the servitude might be destroyed or changed in some way so as to make it impossible to use the servitude for the purposes originally intended. You point out that "[i]t is conceivable that the salt dome might collapse and that the servitude would be considered terminated" and that "the Government could lose at least the right to remove the improvements." You also refer to other ways in which, through circumstances beyond its control, the United States could lose its investment in the land and improvements:

if oil were unavailable to fill the caverns, or if at some future time the Government decided not to use the servitude for hydrocarbon storage, or if the cavern were to collapse, then although the Government's right to use the property would not terminate after ten years' non-use, the Government would have no right to use the servitude for other Government purposes for which the servitude and improvements thereon may be suitable. Moreover, given the limited purposes of the servitude and the fact that prescription would run against one to whom the Government alienated its interest, the potential for the Government's recovery of its investment through sale of its servitude interest, is uncertain.

On the basis of its own analysis of Louisiana law, and the various risks attending the transaction described in the preceding paragraphs, the Land Division has concluded that the title proposed to be acquired is not sufficient to permit approval under the regulations implementing § 255. This position has been based not only on the potential for destruction of the servitude under Louisiana law, but also on the restrictions on use incorporated in the terms of acquisition.

We do not understand you to be asking us to review the reasonableness of the substantive standards contained in the regulations. Rather, you wish an opinion on whether they should be applied to the transaction in question. Thus stated, your request has two parts: first, whether § 255 and its implementing regulations apply at all to transactions of the SPR; and second, if § 255 applies, whether the transaction in question should nonetheless be approved under the regulations as having been "clearly authorized" by Congress.

As noted above, this Department's position for some time now has been that exemptions from the statutory requirement of Attorney General approval must be explicit. We think the terms of § 255 and its legislative history support this interpretation. Prior to its revision in 1970, § 255 provided that no public money should be expended upon any land purchased

by the United States for the purpose of erecting any public building until the Attorney General had given his written opinion "in favor of the validity of the title." The Attorney General was authorized to approve titles subject to infirmities only where the sale price of the land did not exceed $10 per acre, and the total value of the interest being acquired did not exceed $3,500. A number of Federal agencies were exempted in whole or in part from the provisions of § 255, including the Departments of the Army, the Interior, and Agriculture, and the Tennessee Valley Authority. In addition, the Attorney General was specifically authorized to approve title to easements and the rights-of-way under certain circumstances, although apparently not for the purpose of constructing permanent improvements on them. In Pub. L. No. 91–393, 84 Stat. 835 (1970), Congress substantially revised § 255 to simplify and consolidate its provisions, and to centralize in the Attorney General responsibility for approving titles to land or interests in land acquired by the United States. In so doing, it specifically rejected a bill proposed by the Department of Justice that would in effect have made each agency responsible for its own land transactions. Both the Senate and House Committees concluded that "the Attorney General as the chief law officer of the United States should retain the primary responsibility for the approval of land titles." S. Rept. 1111, 91st Cong., 2d sess. 4 (1970); H. Rept. 970, 91st Cong., 2d sess. 3 (1970). The bill passed by Congress in 1970 rescinded the statutory exemptions for all agencies but the Tennessee Valley Authority. Instead, the Act authorized the Attorney General to delegate his responsibility to other departments and agencies, subject to his general supervision, and in accordance with regulations promulgated by him.

Since 1970, then, the Attorney General has had responsibility, either directly or in a supervisory capacity, for approving title to land or interests in land acquired by all Government agencies except the Tennessee Valley Authority. We are informed by the Land Division that this authority has regularly been exercised in connection with land acquisitions by such diverse entities as the St. Lawrence Seaway, the National Park Foundation, and the Pennsylvania Avenue Redevelopment Corporation.[4]

---

[4] Beyond the exemption in § 255 itself for the TVA, there appears to be only one agency whose land transactions have, since 1970, been exempted from § 255 review. Section 410(a) of the Postal Reorganization Act of 1970, 39 U.S.C. § 410(a), exempts the Postal Service from all but certain enumerated Federal laws dealing with, *inter alia,* property and funds. This Department has taken the position that title to land acquired by the Postal Service need not be approved by the Attorney General. Beyond this, Congress has specifically exempted a few categories of land acquisition. *See* 48 U.S.C. § 1409b (Interior Department may construct projects on land acquired in Virgin Islands); *see also* successive appropriation bills since the mid-70s for the Department of Defense and the International Communications Agency, which have contained specific exemptions from the requirement of prior Attorney General approval to acquire land and begin construction of buildings for military housing and other purposes, and for radio facilities in foreign countries. *See, e.g.,* Pub. L. No. 95–457, 92 Stat. 1231 (1978); Pub. L. No. 95–431, 92 Stat. 1021 (1978). The fact that Congress continues to carve out specific exemptions from § 255 lends weight to the view that exemptions from the reach of § 255 will not be implied from a general statutory authorization to acquire interests in land.

We have found nothing in the EPCA or its legislative history to indicate that Congress intended to exempt any transactions from the review applicable to virtually all other agency acquisitions.

We conclude, therefore, that § 255 does apply, and that it requires Attorney General approval of land acquisitions for the SPR. The question then becomes whether the transaction has been or will be "clearly authorized by the Congress" so as to satisfy the requirements contained in Regulation 5. The fact that EPCA authorizes the Secretary generally to purchase interests in land—defined to include the acquisition of an easement or leasehold interest—is not by itself sufficient. Indeed, as we have stated, nothing short of a direct and specific approval by Congress of a particular acquisition will suffice whenever substantial improvements are to be made and the acquisition of less than fee title is contemplated.[5] We therefore reach the issue of whether the submission of this transaction to Congress as a proposed amendment to the SPR plan constitutes an appropriate vehicle for obtaining the necessary specific congressional approval. Stated differently, may the failure of either House of Congress to take any action to block a proposed amendment to the SPR pursuant to the one-House veto provision of § 159 be regarded as constituting the specific congressional approval necessary to satisfy the requirements of the § 255 regulations? We think it cannot.

As you know, the President in his statement of June 21, 1978, to Congress[6] reaffirmed the view expressed both by earlier Presidents and by a succession of Attorneys General that so-called "legislative veto" mechanisms are unconstitutional. The central constitutional principal underlying that often-stated view is that the Constitution prescribes one way—and one way only—for the enactment of laws. The procedure set forth in Article I, section 7, which contemplates affirmative approval of legislative proposals by both Houses followed by submission to the President for the exercise of his veto prerogative, is the exclusive method of lawmaking. While congressional guidance in the form of a resolution of disapproval or veto adopted pursuant to a statute that does not comport with Article I, section 7, may be regarded as performing a useful advisory function, we have repeatedly concluded that even such affirmative acts have no binding legal significance. It follows, *a fortiori,* that Congress' total inaction, by virtue of both Houses' failure to adopt even an advisory resolution with

---

[5]Nor do we believe that an exemption from § 255 must necessarily be implied from the statutory scheme of the EPCA. The legislative history of that Act suggests that Congress anticipated that some land might usefully be acquired for the location of storage and related facilities which would not require the construction of substantial permanent improvements. *See* H. Rept. No. 340, 94th Cong., 1st sess. 35 (1975) (bill authorizes "acquisition of interests in land, storage and related facilities *or* construction of such storage and related facilities ° ° ° ." [Emphasis added.] And, it is our understanding that a leasehold interest or servitude might be acquired on existing pipelines or storage facilities. Therefore, to say that no substantial permanent improvements may be constructed on land that the United States does not own in fee does not nullify the statutory authorization to acquire lesser interests in land.

[6]H. Doc. 95-357, reprinted at 124 CONGRESSIONAL RECORD H. 5879 (June 21, 1978).

respect to any particular amendment of the SPR plan, cannot be regarded as providing the legislative imprimatur required by the regulations. It should be understood, however, that our conclusion would be different if both Houses of Congress acted affirmatively by joint resolution to approve the proposed transaction—an alternative apparently contemplated by § 551(c)(2) of the EPCA, 42 U.S.C. § 6421(c)(2). This section sets forth the procedure for congressional review of Presidential requests to implement certain energy actions. If this course were followed, the President's transmittal message should set forth the limited circumstances under which it is being submitted.[7]

The Comptroller General's conclusion that Congress did intend to authorize construction of improvements on leased land under the EPCA, to which you refer, is not necessarily inconsistent with the position this Department has taken with respect to similar construction on a servitude. The authority under which the Comptroller General passes upon expenditures for the construction of public buildings on leased land is significantly different from that governing the Attorney General's role under § 255. The only specific statutory basis for the Comptroller General's disapproving expenditures over a certain amount is in § 322 of the Economy Act of 1932, 40 U.S.C. § 278a. The Comptroller General's "general rule" that appropriated funds may not be used to make permanent improvements to private property without specific statutory authority, has itself no statutory basis other than those laws that deal generally with appropriations. See 39 Comp. Gen. 388, 390 (1959). The Comptroller General takes the position that neither that rule nor § 322 was intended to apply in situations in which Congress clearly anticipated and approved the making of improvements on land not owned by the United States. Compare 46 Comp. Gen. 60 (1966), with 53 Comp. Gen. 317 (1973). The Comptroller General has no basis upon which to disapprove the amount of an expenditure where the expenditure itself has been explicitly authorized. By contrast, the Attorney General remains responsible under § 255 for determining the sufficiency of title for the purpose intended, whether or not the transaction may otherwise be authorized by law. Congress can therefore reasonably be expected to make itself absolutely clear when the exercise of this responsibility is to be waived.[8]

---

[7] We note that any legislation enacted by Congress, whether by bill or joint resolution and whether passed pursuant to 42 U.S.C. § 6421(c)(2) or without reference to that statute, would suffice to satisfy the requirements of Art. 1, § 7.

[8] Additionally, the interest in land represented by a leasehold is generally of a more certain quality than a servitude under Louisiana law. A lease is for a period certain, and it is therefore possible to predict exactly how long the land will be available for the contemplated use. The Government may plan to construct improvements whose useful life will more or less coincide with the term of the lease, and may otherwise take steps to control the disposition of its investment after the expiration of the lease. A servitude, on the other hand, may be extinguished at any time following its acquisition upon the happening of a number of circumstances beyond the control of the Government. The risk of this happening in the instant case is acknowledged by you. To the extent that a degree of discretion is involved in both situations, we find nothing necessarily incongruous about the differing conclusions reached by the Comptroller General and this Department.

While these differences in statutory responsibility may satisfactorily justify a difference in the conclusions reached heretofore by the Comptroller General and those stated in this opinion, it should be pointed out that insofar as the Comptroller General's opinion purports to rely on the fact of congressional "approval" pursuant to the veto mechanism, we disagree with it. As stated above, we are unable to find any legal significance in the failure of disapproval.

LARRY A. HAMMOND
*Deputy Assistant Attorney General*
*Office of Legal Counsel*